**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.** _____

| | |
|---|---|
| ATLANTIC RECORDING CORPORATION, WARNER BROS. RECORDS INC., UMG RECORDINGS, INC., SONY MUSIC ENTERTAINMENT, and CAPITOL RECORDS, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>ANDREW SAMPSON, AUROUS GROUP, INC., and DOES 1-10<br><br>    Defendants. | **COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF** |

  Plaintiffs Atlantic Recording Corporation, Warner Bros. Records Inc., UMG Recordings, Inc., Sony Music Entertainment, and Capitol Records, LLC, by their attorneys, hereby allege as follows:

**INTRODUCTION**

  1. Plaintiffs are record companies that, along with their affiliated companies, produce, manufacture, distribute, sell, and license the vast majority of legitimate commercial sound recordings in this country. Three days ago, Defendants launched a service that blatantly infringes the Plaintiffs' copyrights by enabling Internet users to search for, stream, and download pirated copies of Plaintiffs' sound recordings for immediate listening and later playback. Defendants have designed their service specifically to search for and retrieve these copies from a carefully chosen set of online sources notorious for offering pirated music, and Defendants are openly encouraging and assisting infringement of Plaintiffs' sound recordings. Defendants'

service uses software called Aurous; this Complaint refers to Defendants' software and service collectively as "Aurous."

2. It is well known that rampant copyright infringement of sound recordings over the Internet has had a devastating impact on the music industry, including on artists who make their living selling and licensing their music. Extensive and costly anti-piracy efforts by Plaintiffs and other copyright owners over the last fifteen-plus years have sought to combat the growth of Internet piracy. At the same time, working with legitimate services, Plaintiffs and other copyright owners have spurred the development of a wide array of legal ways for consumers to enjoy streaming and downloaded music over the Internet. These include such popular services as Apple Music, iTunes, Google Play, Rhapsody, and Spotify, among dozens of others.

3. Two types of Internet piracy have particular relevance to this case. First, certain businesses operate websites offering vast collections of pirated copies of popular recorded music, and locate their operations overseas in an effort to evade U.S. copyright infringement liability. Defendants have designed Aurous to retrieve music exclusively from such known pirate sites.

4. Second, the BitTorrent network – a decentralized Internet network that allows for the rapid uploading and downloading of files among the computers of individual users – is notorious for the availability of pirated copies of popular music, movies, television shows, and other copyrighted works. However, using BitTorrent for piracy requires a certain level of technical knowledge to navigate a variety of software programs, Internet sites, and services to find, download, and play back files found on BitTorrent. In the lead-up to their October 10, 2015 public launch of Aurous, Defendants generated considerable publicity by promising a service that would provide all the unauthorized music available on the BitTorrent network in a

single service (Aurous) easy enough for anyone to use to stream, download, and play back any unauthorized copies of any recorded music they want.

5.  This scheme is reflected in the headline of one article that Defendants linked to as part of their promotion of the service: "Aurous is BitTorrent Music for Your Dad."  In the same vein, referring to "Popcorn Time," a notorious service that similarly makes it easy for users to stream pirated copies of movies and TV shows via the BitTorrent network, Defendants have promoted themselves by linking to an article with the headline: "Introducing the Popcorn Time for Music."  However, although still seeking publicity based on an association with BitTorrent, Defendants to date have not included in their service the ability to search for files on the BitTorrent network; instead, they have designed their service to retrieve recorded music exclusively from the overseas pirate sites mentioned above.

6.  In pre-launch posts on social media, Defendants have freely acknowledged that their service will be used to commit copyright infringement of recorded music, and post-launch, Defendants have already provided technical assistance to facilitate the infringement of Plaintiffs' sound recordings specifically.  On their website, Defendants have boasted that "We've made it easier than ever to search for the songs you want.  Want to listen to your favourite [sic] bands [sic] newest album?  We have it.  Want to enjoy an obscure 80's hit?  We have that too."

7.  On the day after Aurous' October 10, 2015 public launch, which the Defendants have called an "alpha" release (referring to a stage of software development), Defendants reported that thousands of users had already visited their site to download the Aurous software.  The very next day, Defendant Sampson reported that nearly 8,000 users at the moment were visiting the Aurous webpage where downloads of the Aurous software are made available.  Defendants indeed make it effortless for Internet users to infringe Plaintiffs' copyrights,

3

providing the ability to search known overseas pirate websites for unauthorized copies of recorded music and then stream the music live and download it for later playback.  Defendants are well aware of the copyright infringement caused by their service and willfully intend for it to happen.  Defendants receive a financial benefit from the draw of copyright infringement, including in the form of a large and increasing user base, and fail to take steps in their power to stop or limit infringement.

8.  The predictable effect of Defendants' plan to profit from providing an easy-to-use service for copyright infringement over the Internet is to greatly increase infringement of Plaintiffs' copyrights, causing Plaintiffs significant and irreparable harm.  Defendants' business is new, but its business plan is old: illegally profiting from piracy by free riding on the creative efforts and investments of others.  Plaintiffs are entitled to a temporary restraining order and preliminary and permanent injunctive relief to stop Defendants' flagrant violation of Plaintiffs' rights.  Plaintiffs are further entitled to damages, as detailed below.

## NATURE OF THE ACTION

9.  This is an action for copyright infringement under the copyright laws of the United States, Title 17, United States Code §§ 101, *et seq*.

10.  Under Section 106 of the Copyright Act, Plaintiffs have the distinct, severable, and exclusive rights to, among other things, reproduce and distribute their works to the public and to perform those works publicly by means of a digital audio transmission.  17 U.S.C. §§ 106(1), (3), (6).

11.  Plaintiffs seek a declaration that Defendants willfully infringe Plaintiffs' copyrights under federal law.  Plaintiffs also seek an injunction prohibiting Defendants from further infringement of Plaintiffs' copyrights and an injunction, pursuant to Section 502 of the

Copyright Act (17 U.S.C. § 502(a)), 28 U.S.C. § 1651(a), and this Court's inherent equitable powers, prohibiting Defendants and third parties with notice of the injunction from facilitating access to or providing support for any or all domain names and websites through which Defendants infringe Plaintiffs' copyrights and other rights in Plaintiffs' sound recordings. Plaintiffs further seek actual damages or statutory damages in the amount of $150,000 for each infringed work as allowed under Section 504 of the Copyright Act for willful copyright infringement.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193, for at least the following reasons: Defendants are citizens and residents of the State of Florida; Defendants have been operating, conducting, engaging in, or carrying on a business or business venture in this state; Defendants are engaging in, causing, inducing, materially contributing to, supervising and controlling, and receiving a direct financial benefit from copyright infringement within this state; and Defendants are engaged in substantial and not isolated activity within this state.

14. Venue in this District is proper under 28 U.S.C. §§ 1391(b), (c), and (d) and 28 U.S.C. § 1400(a).

## PLAINTIFFS AND THEIR BUSINESS

15. Plaintiff Atlantic Recording Corporation is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

16.     Plaintiff Warner Bros. Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California.

17.     Plaintiff UMG Recordings, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California.

18.     Plaintiff Sony Music Entertainment is a partnership duly formed under the laws of the State of Delaware, with its principal place of business in the State of New York.

19.     Plaintiff Capitol Records, LLC is a limited liability company duly formed under the laws of the State of Delaware, with its principal place of business in the State of California.

20.     Plaintiffs Atlantic Recording Corporation, Warner Bros. Records Inc., UMG Recordings, Inc., Sony Music Entertainment, and Capitol Records, LLC are collectively referred to herein as "Plaintiffs."

21.     Plaintiffs, along with their affiliated companies, are the copyright owners or owners of exclusive rights with respect to the vast majority of copyrighted sound recordings sold in the United States. Under the Copyright Act, Plaintiffs have, *inter alia*, the exclusive rights to reproduce the copyrighted works, to distribute copies or phonorecords of the copyrighted works to the public, to perform publicly the copyrighted works by means of digital transmission, and to authorize or license any such activities. *See* 17 U.S.C. §§ 106(1), (3), (6). Plaintiffs are also the owners of sound recordings protected under state law.

22.     Plaintiffs manufacture, distribute, license, and sell phonorecords (e.g., the material objects and/or digital files containing recorded music) in the form of CDs, cassettes and other tangible media. Plaintiffs also distribute their sound recordings in the form of digital audio

files delivered or performed via the Internet. Plaintiffs and legitimate services with which they work provide a wide variety of authorized ways for consumers to enjoy recorded music distributed and performed over the Internet, including digital download and/or streaming services like Apple Music, iTunes, Google Play, Amazon, Rhapsody, Spotify, and many others. Unlike Defendants' service, these services operate lawfully and pay Plaintiffs for sound recordings that they distribute or perform.

23.     Plaintiffs have invested and continue to invest significant money, time, effort, and creative talent to discover and develop recording artists, and to create, manufacture, advertise, promote, sell, and license sound recordings embodying their performances. Plaintiffs, their employees, their recording artists, and others in the music industry are compensated for their creative efforts and monetary investments largely from the sale and distribution of sound recordings to the public, including the authorized online sale and distribution described above.

24.     Attached as Exhibit A is an exemplary initial list of a small number of the numerous and rapidly growing number of sound recordings to which Plaintiffs and/or their affiliated and/or predecessor companies own exclusive rights under copyright that have been and are being infringed by Defendants. As set forth in Exhibit A, the copyright in each of these sound recordings is registered in the United States Copyright Office. *See* 17 U.S.C. §§ 409-412. Plaintiffs intend to amend the Complaint at an appropriate time to provide an expanded list of works infringed by Defendants.

## DEFENDANTS

25.     Defendant Andrew Sampson ("Sampson") lives in North Miami, Florida. On information and belief, he is personally directing and participating in, and personally receiving a direct financial benefit from, the conduct alleged herein. Sampson describes himself as the lead

software developer for the Aurous service and the individual responsible for decisions regarding the service.  Sampson is the President of Defendant Aurous Group, Inc.

26. Defendant Aurous Group, Inc. ("Aurous Group") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in North Miami, Florida.

27. Defendants Does 1-10 are individuals who, along with Defendants Sampson and Aurous Group, own and/or operate Defendants' service, but whose identities and addresses are currently unknown to Plaintiffs.

28. Defendants Sampson, Aurous Group, and Does 1-10 are collectively referred to as "Defendants."  On information and belief, at all times relevant hereto, Defendants served as the agents of one another in infringing Plaintiffs' copyrights.

## DEFENDANTS' INFRINGING CONDUCT

29. Aurous is a service that exists for one reason: to profit from the infringement of popular copyrighted recorded music, the vast majority of which is owned or controlled by the Plaintiffs here.

30. In early 2015, at the website www.getstrike.net, Defendant Sampson publicly released a search engine called "Strike Search," specifically designed to promote copyright infringement on the BitTorrent network, which is notorious as a source for pirated music, movies, games, and software.  Sampson promoted Strike Search as "[a] modern approach to BitTorrent searching [–] download music, movies, games, and software.  Right at your fingertips."  Sampson even boasted of the searches for infringing content made possible by his service, and demonstrated his specific knowledge of such infringing activity, by showing off the results of a temporary live feed of searches using Strike Search.  Sampson declared: "Want to see

what the pirates of the world fancy?  Check out the temporary live search feed getstrike.net/torrents/live/."

31. Sampson also published Terms of Service that brazenly flaunted his service's facilitation of copyright infringement.  The terms stated: "You promise not to sue us or tell our mothers we've been naughty."  They also promised users: "We don't log[,] and tracking information is thrown away every 24 hours."  Finally, to copyright owners: "If you have a take down request, go away."  Sampson sought donations via a link to online payment service PayPal, until PayPal limited his account in response to complaints by copyright owners.

32. As a stand-alone search engine, Strike Search finds infringing content on BitTorrent but needs to be used with other software and services in order to download the content onto users' computers.  Efforts by services profiting from infringement to evade copyright liability have led to the disaggregation of features for finding and downloading content via BitTorrent that normally would be provided in a single application.

33. For instance, users of legitimate services like Apple Music or Spotify can use those applications to search for music, download or stream it, and play it back.  By contrast, users seeking to infringe via the BitTorrent network typically must first download a BitTorrent application that has no search function.  Then they must use their web browser to locate a "torrent" site, or other source, that may provide search or browsing functionality to help the users locate a "torrent" that contains information that can lead to the download of the infringing content the users are looking for.  These sites are often located overseas to try to evade U.S. authorities.  Once the "torrent" is selected, the users' BitTorrent application works behind the scenes, typically by interacting with another type of Internet service, known as a "tracker," that

facilitates the download of the content from the computers of multiple other BitTorrent users. Then the users must choose another application to play back the content.

34. Defendants garnered significant attention for their new service, Aurous, by promoting it as a way to make it easy for anyone to gain access to infringing music files on the BitTorrent network and from other sources with a single easy-to-use all-in-one infringement and playback service for unauthorized music. With easy-to-use features, including an interface familiar to users of services like Spotify or Google Play, Aurous indeed makes the unauthorized streaming and downloading of infringing content over the Internet so easy that anyone can use it. To date, instead of using the BitTorrent network, Defendants have programmed their software to retrieve music files exclusively from a carefully selected set of pirate websites notorious for distributing unauthorized copies of popular recorded music.

35. By default, Defendants' service directs users' searches to what Defendants call "the Aurous Network." The Aurous Network appears to consist of a single known pirate site based in Russia called Pleer (formerly known as Prostopleer) ("Pleer"). Pleer has been the subject of repeated copyright complaints by rights holders to the Russian government. Its home page brazenly offers free unauthorized downloads of major recording artists' top tracks for the week, year, and all time.

36. Defendants' service also gives users the option, instead of using the Aurous Network, to retrieve music files from either MP3WithMe or VK.com. MP3WithMe is another known pirate site, based overseas, that also brazenly offers free unauthorized downloads of top tracks by major recording artists. VK.com is a Russian website notorious for the availability of infringing music and other media files. Copyright owners have sent infringement notices regarding more than 2 million infringements on VK to Google alone. The U.S. Trade

Representative has for four years in a row included VK.com in his periodic list of "Notorious Markets" – overseas sites that engage in and facilitate substantial piracy.

37. The Aurous service is composed of a number of components, and the names and organization of these components suggest that in addition to the aforementioned sites, Defendants' service also can search a site known as "MP3Skull." This is another notorious pirate site, based overseas, whose homepage also brazenly offers unauthorized copies of recording artists' top tracks. The U.S. Trade Representative has also included MP3Skull in his periodic list of "Notorious Markets" – overseas sites that engage in and facilitate substantial piracy. Earlier this year, Plaintiffs here and certain affiliates sued MP3Skull in this District for its massive infringement of their copyrights. MP3Skull failed to appear to defend the action, and the plaintiffs have moved for a default judgment.

38. Defendants have no authorization or permission to copy, distribute, or publicly perform Plaintiffs' copyrighted sound recordings.

39. Aurous nevertheless advertises that "[w]e've made it easier than ever to search for the songs you want. Want to listen to your favourite [sic] bands [sic] newest album? We have it. Want to enjoy an obscure 80's hit? We have that too." Once users download the free Aurous software from the website www.aurous.me, they are instantly able to use Aurous's search functionality to find wide selections of unauthorized copies of Plaintiffs' copyrighted sound recordings. For example, searches on Aurous enable users easily to download top hits from such major recording artists as Katy Perry, Lady Antebellum, Neon Trees, Brandon Flowers, Neil Young, Collective Soul, Alicia Keys, and Miley Cyrus.

40. Once users have selected the content they want, Aurous behind the scenes does all the work. Aurous finds sources for the files and then streams the files to its users in its custom

media player and allows users to download (copy) the files by simply pressing a "+" sign next to a track. Aurous thus also builds for users libraries of pirated sound recordings.

41. By providing this all-in-one infringement service, Defendants give themselves a significant unfair advantage over competing legitimate services for music streaming and downloading that charge a fee or are supported by advertising. Defendants even prominently promote their service with the slogan: "Enjoy music how you want to for free."

42. By providing and operating their pirate service, Defendants are causing the infringement of Plaintiffs' copyrights by others. Defendants also have evidenced the intent to cause such infringement. By way of example only, in a conversation on Twitter, Defendant Sampson referred to Popcorn Time, software notorious for facilitating copyright infringement of movies and TV shows via the BitTorrent network, and agreed that "I guess you can call" Aurous "the [P]opcorn [T]ime of music," adding that "I contribute to Popcorn Time a bit." By way of further example, it is well known that anti-piracy services attempt to diminish infringement of copyrighted works on the Internet by offering fake, or spoofed, files on networks where infringement is common. In a media interview, Defendant Sampson promised that Aurous is "able to spot fakes."

43. By providing and operating their service, Defendants are materially contributing to the infringement of Plaintiffs' copyrights by others, and are doing so with knowledge of the infringing activity that they are facilitating. By way of example only, users have already informed Defendants of specific infringing activity on their service, and Defendants have provided technical assistance to facilitate the infringement of Plaintiffs' sound recordings specifically.

44.     By providing and operating their service, Defendants are receiving a direct financial benefit from copyright infringement in the form of a growing base of users that Defendants can monetize now or later with advertising and other methods of generating revenue. Defendants have stated their intent to display advertising on Aurous.  Defendants have the right and ability to stop or limit the infringing activity occurring via their service but they take no steps to do so.  Defendants are able to supervise or control the infringing activity of their users in many different ways, including by deciding the sources from which Aurous can and cannot retrieve music files, and through the ability to remotely alter the behavior of the Aurous service by issuing automatic updates to software installed on users' computers.  Defendants have admitted that if they wanted to they could exercise control over their service to help copyright owners remove infringing works by applying filters to block certain content from Aurous.  In addition, Defendants design and maintain their service to optimize its usefulness for infringement.  By way of example only, in a conversation on Twitter, asked about "shield[ing]" himself and his users from "take down[]" requests from copyright owners, Defendant Sampson responded: "Don't worry, we're taking every measure to protect ourselves and our users."  By way of further example, in response to a comment on social media that infringing users' computer addresses might be exposed to anti-piracy services, Sampson responded that the addresses would be hidden because "VPN [virtual private network] is built in."

45.     Defendants' causing and facilitation of copyright infringement is knowing, intentional, and willful.

## COUNT I
## Inducement of Copyright Infringement

46.     Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

47. As detailed above, users of Defendants' service are engaged in repeated, widespread, and rapidly growing infringement of Plaintiffs' exclusive rights under the Copyright Act.

48. Defendants are liable under the Copyright Act for inducing the infringing acts of the users of Aurous. Defendants have designed and launched and are operating Aurous with the object of promoting its use to infringe Plaintiffs' copyrights.

49. Defendants knowingly and intentionally induce, entice, persuade, and cause users of Aurous to infringe Plaintiffs' copyrights in their sound recordings, including but not limited to those sound recordings listed in Exhibit A hereto, in violation of Plaintiffs' copyrights.

50. Through these activities, among others, Defendants knowingly and intentionally take steps that are substantially certain to result in direct infringement of Plaintiffs' sound recordings, including but not limited to those sound recordings listed in Exhibit A hereto, in violation of Plaintiffs' copyrights.

51. Despite their knowledge that infringing material is made available to users by means of Aurous, Defendants have failed to take reasonable steps to minimize its infringing capabilities.

52. The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

53. Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

54. As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work

infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

55. Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

56. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a temporary restraining order and preliminary and permanent injunctive relief prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT II

### Contributory Copyright Infringement

57. Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 45, and 47 through 56, as if fully set forth herein.

58. As detailed above, users of Defendants' service are engaged in repeated, widespread, and rapidly growing infringement of Plaintiffs' exclusive rights under the Copyright Act.

59. Defendants are liable as contributory copyright infringers for the infringing acts of users of Aurous. Defendants have specific, actual, and constructive knowledge of both the infringing activity at the sources of unauthorized copies of Plaintiffs' works that Aurous locates and to which it links, and of the infringing activity of Aurous's users. Defendants knowingly cause and otherwise materially contribute to their users' infringements of Plaintiffs' copyrighted sound recordings, including but not limited to those sound recordings listed in Exhibit A hereto.

60. The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

61. Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

62. As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

63. Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

64. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a temporary restraining order and preliminary and permanent injunctive relief prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT III

### Vicarious Copyright Infringement

65. Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 45, 47 through 56, and 58 through 64, as if fully set forth herein.

66. As detailed above, users of Defendants' service are engaged in repeated, widespread, and rapidly growing infringement of Plaintiffs' exclusive rights under the Copyright Act.

67. Defendants are vicariously liable for the infringing acts of users of Aurous. Defendants have the right and ability to supervise and control the infringing activities that occur through the use of Aurous, and at all relevant times have derived a direct financial benefit from the infringement of Plaintiffs' copyrights. Defendants have failed to take any meaningful action to prevent the widespread and rapidly growing infringement by their users and in fact have taken affirmative steps to encourage, promote, and assist infringement by their users. Defendants are therefore vicariously liable for the infringement of Plaintiffs' copyrighted sound recordings, including but not limited to those sound recordings listed in Exhibit A hereto.

68. The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

69. Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

70. As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

71. Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

72. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502 and Federal Rule of Civil Procedure 65(d), Plaintiffs are entitled to a temporary restraining order and preliminary and permanent injunctive relief prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

* * *

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a) for a declaration that Defendants willfully infringe Plaintiffs' copyrights;

(b) for such equitable relief under Titles 17 and 28 as is necessary to prevent or restrain infringement of Plaintiffs' copyrights, including:

i. a temporary restraining order, preliminary injunction, and permanent injunction requiring that Defendants and their officers, agents, servants, employees, attorneys, and all persons who in active concert or participation with each or any of them, (a) cease infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiffs' copyrights protected by the Copyright Act, whether now in existence or hereafter created, including, but not limited to, by providing hosting services that facilitate such infringement; and (b) surrender, and cease to use, the domain name of www.aurous.me;

ii. entry of an Order, pursuant to Section 502 of the Copyright Act (17 U.S.C. § 502), 28 U.S.C. § 1651(a), and this Court's inherent equitable powers,

(A) enjoining Defendants and all third parties with notice of the Order, including any Web hosts, domain name registrars, domain name registries, or their

administrators, from facilitating access to any or all domain names, URLs, and websites (including, without limitation, www.aurous.me) through which Defendants infringe Plaintiffs' copyrights;

      (B)    requiring domain name registries and/or registrars holding or listing Defendants' domain names and websites (including, without limitation, www.aurous.me) through which Defendants infringe Plaintiffs' copyrights to: (a) disable www.aurous.me and any related domain names specified by Plaintiffs through a registry hold or otherwise, and to make them inactive and non-transferable, and (b) transfer Defendants' domain names to a registrar to be appointed by Plaintiffs to re-register the domain names in Plaintiffs' names and under Plaintiffs' ownership;

      (C)    enjoining all third parties with notice of the Order from maintaining, operating, or providing advertising, financial, technical, or other support to Defendants and any other domain names, URLs or websites through which Defendants infringe Plaintiffs' copyrights, including without limitation www.aurous.me; and

      (D)    enjoining all third-party distributors of applications, toolbars, or similar software with notice of the Order from distributing any applications, toolbars, or similar software applications that interoperate with any domain names, URLs or websites through which Defendants infringe Plaintiffs' copyrights, including without limitation www.aurous.me.

(c)    for statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 per infringed work, arising from Defendants' violations of Plaintiffs' rights under the Copyright Act or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs' actual damages, including Defendants' profits from infringement, in amounts to be proven at trial;

  (d) for Plaintiffs' costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505 and otherwise;

  (e) for prejudgment and post-judgment interest; and

  (f) for such other relief as the Court may deem just and proper.

Dated:  October 13, 2015      Respectfully submitted,

           By:  /s/ Karen L. Stetson
             Karen L. Stetson

             GRAY-ROBINSON, P.A.
             Karen L. Stetson (FL Bar No. 742937)
             333 S.E. Second Avenue, Suite 3200
             Miami, FL  33131
             Telephone:  (305) 416-6880
             Facsimile:  (305) 416-6887

             WILLIAMS & CONNOLLY LLP
             Thomas G. Hentoff (*Pro Hac Vice to be filed*)
             Casey L. White (*Pro Hac Vice to be filed*)
             725 12th Street, N.W.
             Washington, D.C. 20005
             Telephone:  (202) 434-5000
             Facsimile:  (202) 434-5029

             *Attorneys for Plaintiffs*