**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No. 15-cv-23810-MARTINEZ/GOODMAN**

ATLANTIC RECORDING CORPORATION,
WARNER BROS. RECORDS INC., UMG
RECORDINGS, INC., SONY MUSIC
ENTERTAINMENT, and CAPITOL RECORDS,
LLC,

                Plaintiffs,

        v.

ANDREW SAMPSON, AUROUS GROUP, INC.
and DOES 1-10,

                Defendants.

**PLAINTIFFS' EXPEDITED MOTION FOR ISSUANCE OF A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND
ACCOMPANYING MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..............................................................................................................2

    A.    Plaintiffs' Businesses ...................................................................................2

    B.    Defendants' Unlawful Activities Inducing, Causing, Contributing to,
          Controlling, and Financially Benefiting from Copyright Infringement.................3

    C.    Irreparable Harm to Plaintiffs .......................................................................8

ARGUMENT ................................................................................................................9

I.    A TRO AND PRELIMINARY INJUNCTION SHOULD ISSUE RESTRAINING
    AND PREVENTING DEFENDANTS' FLAGRANT COPYRIGHT
    INFRINGEMENT.................................................................................................9

    A.    A Substantial Likelihood Exists That Plaintiffs Will Prevail On The Merits .......10

          1.    Defendants Are Intentionally Inducing Copyright Infringement..............10

          2.    Defendants Are Committing Contributory Copyright Infringement .........12

          3.    Defendants Are Committing Vicarious Infringement...............................13

    B.    Defendants' Infringing Conduct Is Irreparably Harming Plaintiffs in Ways
          That Cannot Be Remedied Without Injunctive Relief Now ................................15

    C.    The Balance Of Hardships Weighs Decidedly In Favor Of Plaintiffs.................18

    D.    Public Policy Favors The Issuance Of A Temporary Restraining Order
          And Preliminary Injunction ..........................................................................19

II.    AN INJUNCTION BOND SHOULD BE WAIVED .......................................................19

CONCLUSION..............................................................................................................19

Atlantic Recording Corporation, Warner Bros. Records Inc., UMG Recordings, Inc., Sony Music Entertainment, and Capitol Records, LLC ("Plaintiffs") respectfully move under 17 U.S.C. § 502 and Federal Rule of Civil Procedure 65 for a temporary restraining order ("TRO"), to be followed by a preliminary injunction, against Defendants Andrew Sampson and Aurous Group, Inc. ("Defendants"), and those in active concert or participation with them, or who aid or abet their conduct.

Four days ago, on Saturday, October 10, 2015, Defendants publicly launched a service designed for the unauthorized streaming and downloading of recorded music over the Internet. Defendants are following the business model of notorious copyright-infringing services like Napster and Grokster by – over the objection of copyright owners – enabling Internet users easily to find, stream, and download (copy) pirated copies of copyrighted music owned by others.  Predictably, the lure of getting something for nothing as part of an easy-to-use service for infringement is causing Defendants' days-old service to explode in popularity, resulting in rapidly expanding infringement of copyrighted sound recordings owned by Plaintiffs and others.

Immediate injunctive relief is needed to prevent and restrain Defendants' flagrant facilitation of rampant and growing infringement of Plaintiffs' copyrights.  Defendants are willfully engaging in intentional inducement of copyright infringement, contributory copyright infringement, and vicarious copyright infringement in violation of the U.S. Copyright Act. Defendants have brazenly designed their service specifically to retrieve copies of copyrighted sound recordings from a carefully chosen set of overseas websites notorious for offering pirated music, and Defendants are openly encouraging and assisting infringement of Plaintiffs' sound recordings.  Defendants' service and the software that powers it are called Aurous; this motion refers to Defendants' software and service collectively as "Aurous."

Plaintiffs filed and hand-served the Complaint and Summonses yesterday, the first business day after the launch of Defendants' service.  In a letter hand-delivered with the Summonses and in a phone call at 3:00 p.m. yesterday, Plaintiffs gave Defendants notice that they would be filing this motion for a TRO and preliminary injunction.  Plaintiffs are also emailing and hand delivering these motions papers to Defendants concurrently with this filing. *See* Declaration of Thomas G. Hentoff ("Hentoff Decl.") ¶ 2.

## BACKGROUND

### A.      Plaintiffs' Businesses

Plaintiffs are record companies that, along with their affiliated companies, produce, manufacture, distribute, sell, and license the vast majority of legitimate commercial sound recordings in this country and own or have exclusive rights in the copyrighted works that are embodied in those sound recordings.  Plaintiffs manufacture, distribute, license, and sell phonorecords (e.g., the material objects and/or digital files containing recorded music) in the form of CDs, cassettes and other tangible media.  Plaintiffs also distribute their sound recordings in the form of digital audio files delivered or performed via the Internet.  Plaintiffs and legitimate services with which they work provide a wide variety of authorized ways for consumers to enjoy recorded music distributed and performed over the Internet, including digital download and/or streaming services like Apple Music, iTunes, Google Play, Amazon, Rhapsody, Spotify, and many others.  These services operate lawfully and pay Plaintiffs for sound recordings that they distribute or perform.  *See* Declaration of Ellen Hochberg ("Hochberg Decl.") ¶ 4; Declaration of Wade Leak ("Leak Decl.") ¶ 4; Declaration of Alasdair J. McMullan ("McMullan Decl.") ¶ 4.

Plaintiffs have invested and continue to invest significant money, time, effort, and creative talent to discover and develop recording artists, and to create, manufacture, advertise, promote, sell, and license sound recordings embodying their performances.  Plaintiffs, their

employees, their recording artists, and others in the music industry are compensated for their creative efforts and monetary investments largely from the sale and distribution of sound recordings to the public, including the authorized online sale and distribution described above. Hochberg Decl. ¶ 4; Leak Decl. ¶ 4, McMullan Decl. ¶ 4.

**B.      Defendants' Unlawful Activities Inducing, Causing, Contributing to, Controlling, and Financially Benefiting from Copyright Infringement**

Defendant Sampson is a Miami-based software developer and website operator with a history of providing services to promote, facilitate, and shield copyright infringement over the Internet. *See* Hentoff Decl. ¶ 3 (Sampson operating Internet search engine for infringing content; web page "terms of service" promising infringer users that "tracking information is thrown away every 24 hours" and telling copyright owners: "If you have a take down request, go away."). He formed Defendant Aurous Group, Inc. ("Aurous Group") in June 2015. *See* Declaration of Mark McDevitt ("McDevitt Decl.") ¶ 18. Defendants launched their Aurous service to the public in "alpha," or testing, mode on October 10, 2015. Declaration of Prof. Ian Foster ("Foster Decl.") ¶ 7.

Aurous is designed specifically to enable Internet users to listen to and make permanent copies of unauthorized copies of recorded music, including Plaintiffs' copyrighted recorded music. While legitimate Internet music services, like Apple Music, iTunes, or Spotify, enter into business agreements with Plaintiffs and other copyright owners in order to distribute and stream music to consumers for a fee or other consideration, Plaintiffs instead attract users by giving them the ability to find and download free music from known pirate websites with overseas operations. *See* Hochberg Decl. ¶ 7; Leak Decl. ¶ 7, McMullan Decl. ¶ 7; McDevitt Decl. ¶¶ 3-4. Defendants' service gives its users immediate and seamless access to pirate websites, and enables unauthorized downloading of copyrighted music to users' computers.

Defendants make the Aurous software available, for free, at their website www.aurous.me.  Users simply download and install the software on their computers, open the Aurous computer program, and immediately can begin using Aurous to search for any music they want.  Once users select a music track, they may either press a button and download it (making a copy), thus permanently adding the track to their music library, or stream it (listen to it without keeping a copy).  And users can do this again and again, for free, with the only limitation being the size of their computer's storage.  *See* Foster Decl. ¶¶ 9-10, 12.  Defendants thus attract users by giving away wide selections of popular works by top recording artists, including those who record on Plaintiffs' labels.  For example, shortly after Aurous launched, an investigator for Plaintiffs was able to use Aurous to download 40 of the top 40 most popular songs on the current Billboard "Hot 100."  *See* McDevitt Decl. ¶ 20.  By way of further example, searches on Aurous enable users to make infringing copies of top hits from such major recording artists as Katy Perry, Lady Antebellum, Neon Trees, Brandon Flowers, Neil Young, Collective Soul, Alicia Keys, and Miley Cyrus.  *See id.* ¶ 19.  These are Plaintiffs' copyrighted recordings and the evidence of their infringement is just the tip of the iceberg.

Where do Defendants find these unauthorized copies of recorded music for their users?  Examination of the Aurous service provides a very simple answer: Defendants have designed Aurous to retrieve files from a carefully selected set of websites, run by operations based overseas, that are well known as sources of vast selections of pirated music.  Aurous's default setting is to search what Defendants call the "Aurous Network," which is in fact a known pirate website, with a presence in Russia, called Pleer.com (formerly known as Prostopleer.com) ("Pleer").  A visit to Pleer's home page shows the website brazenly offering for streaming and downloading pirated sound recordings of top recording artists.  *See* Foster Decl. ¶ 26; McDevitt

Decl. ¶ 5. Aurous permits alternate searches of only two or three other websites: MP3With, VK.com, and MP3Skull. *See* Foster Decl. ¶¶ 13, 24, 25 (noting that MP3Skull functionality may not be operational). All three of these sites are also known pirate websites where infringing copies of popular music are readily available. These sites have been the subject of hundreds of thousands of copyright infringement notices and two of the sites have been listed by the U.S. Trade Representative as "Notorious Markets" – overseas sites that engage in and facilitate substantial piracy. McDevitt Decl. ¶¶ 6-8.[1]

Defendants have no authorization or permission to copy, distribute, or publicly perform Plaintiffs' copyrighted sound recordings. Hochberg Decl. ¶ 7; Leak Decl. ¶ 7, McMullan Decl. ¶ 7. Defendants nevertheless advertise that "[w]e've made it easier than ever to search for the songs you want. Want to listen to your favourite [sic] bands [sic] newest album? We have it." Hentoff Decl., ¶ 4, Ex. 3.

In just the short amount of time leading up to and following the October 10 public launch of Aurous, Defendants have demonstrated, in a number of additional ways, their intent to induce infringement by Aurous users, their material contribution to infringement with actual knowledge of infringing activity, and their direct financial benefit from infringement while failing to exercise their right and ability to supervise or control it. By way of example only:

● The Aurous home page promotes the service by showing an image of blatant infringement of a famous album – Pink Floyd's *The Wall* – the rights to which are owned by an

---

[1] After Plaintiffs sued, Defendants added an additional, alternate search option to the service, a website called SoundCloud. Downloads from SoundCloud using Defendants' service are also patently unauthorized and infringing. Indeed, SoundCloud's developer terms of service expressly forbids them: "Except for session-based caching referred to above, your app must not offer offline access to any User Content including, in the case of audio User Content, as permanent downloads or temporary downloads for offline listening . . . ." Hentoff Decl., ¶ 13, Ex. 12; *see also id.* (prohibiting apps from aggregating streams to create on-demand listening service).

affiliate of Plaintiffs Atlantic Recording Corporation and Warner Bros. Records Inc.  The image shows the Aurous application locating 3,482 results for the search "pink floyd the wall" with the track "Comfortably Numb" ready for downloading.  Hentoff Decl. ¶ 5.  In addition, by promoting their service with prominently placed album art from famous major-label artists – Pink Floyd's *The Wall* has sold more than 23 million units in the United States – Defendants are sending the clear message that users can find and download Plaintiffs' copyrighted sound recordings using Aurous.

- "Popcorn Time" is a notorious service that serves no other purpose than allowing Internet users easily to find and watch pirated copies of movies and TV shows.  McDevitt Decl. ¶ 15.  Defendants, to attract users to their own infringing service, linked to an article that called Aurous "Popcorn Time for music."  *Id.* ¶ 14.

- "Grooveshark" was another service notorious for providing pirated music to users for streaming and download.  Lawsuits by Plaintiffs and their affiliates won a permanent injunction against Grooveshark's illegal service.  McDevitt Decl. ¶ 16.  Promoting Aurous, Defendants promised a feature that would permit former infringing users of Grooveshark to transfer their Grooveshark "playlists" (collections of songs) and play them on Aurous.  *Id.*

- It is well known that anti-piracy services attempt to diminish infringement of copyrighted works on the Internet by offering fake, or spoofed, files on networks where infringement is common.  In a media interview, Defendant Sampson promised that Aurous is "able to spot fakes."  Hentoff Decl. ¶ 6.

- Defendant Sampson gave users personal assistance in downloading obviously infringing copies of popular recorded music, including copies embodying copyrights owned by Plaintiffs or their affiliates, even after the users showed him screenshots of their specific

infringing activity.  Hentoff Decl. ¶ 7, Ex. 6 (assisting user to download unauthorized copies of tracks by a UMG Recordings, Inc. affiliate's recording artist Ellie Goulding and by Sony Music recording artist Madeon); *id.* ¶ 8, Ex. 7.

●    Defendants have repeatedly admitted that they can and do exercise control over the rampant infringement occurring on their service.  Defendants have exercised control over infringement by, among other things, choosing the websites from which their service retrieves music files, placing limits on the number of search results returned, and implementing automatic updating of their software to enable Defendants to change the behavior of the software installed on users' computers.  Defendants have admitted that they can filter content to block infringing activity from search results but generally will not do so.  Foster Decl. ¶¶ 35, 36 & Ex. F (Aurous admitted it could "help apply filters to mitigate [certain infringement] off our network").  Defendants also have the ability to require user accounts (which could be used to block infringers) and have partially implemented the functionality (the software refers to user accounts and passwords) but have chosen not to offer or require user accounts.  *Id.* ¶ 34.  Instead of exercising that control to stop or limit infringement, Defendants exercise it to protect infringement and thwart copyright enforcement.  Tellingly, in a conversation on Twitter, asked about "shield[ing]" himself and his users from "take down[]" requests from copyright owners, Defendant Sampson responded: "Don't worry, we're taking every measure to protect ourselves and our users."  And in response to a comment on social media that infringing users' computer addresses might be exposed to anti-piracy services, Sampson responded that the addresses would be hidden from public view by built-in privacy tools.  *See* Hentoff Decl. ¶ 9.

●    Defendants are using the draw of infringement to attract users, with plans to monetize their growing user base.  In an interview given before this lawsuit was filed, Defendant

Sampson set out these plans: "In terms of financial support Aurous will be completely free. From time to time you may see a banner based ad or sponsored content . . . . Of course we will provide people with other options to get rid of ads entirely." Hentoff Decl. ¶ 6.

**C.   Irreparable Harm to Plaintiffs**

Just four days after its public launch, Aurous is being used to infringe copyrights, including Plaintiffs' copyrights, in large and rapidly expanding numbers. On the day after Aurous' October 10, 2015 public launch, Defendants reported that thousands of users had already visited their site to download the Aurous software. The very next day, Defendant Sampson reported that nearly 8,000 users <u>at the moment</u> were visiting the Aurous website to download the software. Hentoff Decl. ¶ 10. The next day after that, the number jumped again, with Defendant Sampson reporting: "The download speed is being share[d] with <u>13,492</u> other people downloading it <u>right now</u>." *Id.* 11 (emphasis added). With the large and growing number of people downloading the software <u>at one time</u>, Defendants may already have hundreds of thousands of users using their service to infringe. And once distributed, Defendants' software itself can be limitlessly copied and distributed to other users. <u>Every day</u> that Defendants' infringement is allowed to continue, more and more users join Defendants' service and make more and more infringing copies of Plaintiffs' works, causing harm that simply cannot be remedied later. Hochberg Decl. ¶ 9(b); Leak Decl. ¶ 9(b), McMullan Decl. ¶ 9(b).

By providing this all-in-one infringement service, Defendants also are giving themselves a significant unfair advantage over competing legitimate services for music streaming and downloading that charge a fee or are supported by advertising. Defendants even prominently promote this unfair advantage with the slogan: "Enjoy music how you want to for free." Hentoff Decl. ¶ 3. This unfair competition with legitimate services threatens to diminish the value to these services of Plaintiffs' copyrighted recordings, which in turn threatens to devalue Plaintiffs'

copyrights in ways that cannot be quantified.  Hochberg Decl. ¶ 9(c) and (e); Leak Decl. ¶ 9(c) and (e), McMullan Decl. ¶ 9(c) and (e).  As one technology journalist observed after testing Defendants' service yesterday, Aurous "takes aim at other[, legitimate] services by encouraging people to switch."  D. Misener, CBC News, "Aurous Targets Spotify, Apple with Free Music Service," Oct. 13, 2015 (Hentoff Decl., ¶ 12, Ex. 11).  And confirming the threat to Plaintiffs from the allure of unlimited free music for nothing, the journalist also observed: "I was able to stream (and download) a bunch of new music, and I was not asked to pay for anything.  <u>In some ways, using Aurous feels a lot like using Napster did 15 years ago.</u>"  *Id*. (emphasis added).

**ARGUMENT**

**I.     A TRO AND PRELIMINARY INJUNCTION SHOULD ISSUE RESTRAINING AND PREVENTING DEFENDANTS' FLAGRANT COPYRIGHT INFRINGEMENT**

To obtain a TRO or preliminary injunction, a plaintiff must establish that: (1) there is a "substantial likelihood that it will succeed later on the merits"; (ii) it "will suffer an irreparable injury absent [preliminary] relief"; (iii) the harm that it "will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction"; and (iv) that preliminary relief would not "disserve the public interest."  *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

"[T]he crucial question" on a motion for a TRO "is whether preservation of the status quo is necessary in order to protect the court's ability to render a meaningful decision on the merits." *Louis v. Meissner*, 530 F. Supp. 924, 925-26 (S.D. Fla. 1981); *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.") (internal citation omitted).  Here, Defendants are blatantly committing wholesale copyright infringement of Plaintiffs' works, with a service that is rapidly becoming popular.  The harm to Plaintiffs is expanding every day that Defendants' illegal

9

service operates, in ways that are impossible to quantify or remedy later. Each of the four preliminary relief factors thus weigh heavily in favor of a TRO and a preliminary injunction.

### A.      A Substantial Likelihood Exists That Plaintiffs Will Prevail On The Merits

Plaintiffs have sued on three separate counts of secondary copyright infringement: intentional inducement of infringement, contributory infringement, and vicarious infringement. *See* Compl. ¶¶ 46-56 (intentional inducement of infringement), ¶¶ 57-64 (contributory infringement), ¶¶ 65-72 (vicarious infringement). A likelihood of success on any one count would justify a TRO and preliminary injunctive relief, and Plaintiffs here establish a likelihood of success on all three.

As an initial matter, Plaintiffs satisfy the threshold showings for secondary liability that (1) Plaintiffs own or have exclusive rights in copyrights that have been infringed, and (2) third parties have engaged in the direct infringement of Plaintiffs' copyrights for which Defendants are secondarily liable. *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1159, 1169 (9th Cir. 2007); 17 U.S.C. §§ 106(1), (3). Plaintiffs have presented evidence of 20 exemplary copyrights that they own, *see* Leak Decl. ¶ 6; McMullan Decl. ¶ 6; and Hochberg Decl. ¶ 6, and have proof that unauthorized copies of sound recordings embodying those copyrighted works were directly copied and distributed using Defendants' Aurous service, *see* McDevitt Decl. ¶ 19; *see also A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights.").

### 1.      Defendants Are Intentionally Inducing Copyright Infringement

A Defendant is liable for intentional inducement of copyright infringement when it (1) provides a device, product, or service; (2) with the object or intent of promoting its use to infringe copyright; and (3) the device, product, or service (4) causes acts of infringement by another. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013);

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 934, 931 (2005); *Disney Enterprises, Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *30-38 (S.D. Fla. Sept. 30, 2013).

There is no dispute that by designing, distributing, updating, and maintaining their Aurous software and service, Defendants are providing a product or service. Nor can there be any dispute that Aurous is causing the infringement of Plaintiffs' copyrighted works by individuals using Defendants' service to engage in the unauthorized downloading of Plaintiffs' copyrighted sound recordings.

The evidence here is overwhelming that Defendants act with the object or intent of promoting their service to infringe copyright, as shown by the evidence of intent to infringe relied on by courts in leading cases. In *Grokster*, for example, the Supreme Court held that a defendant had induced copyright infringement by distributing a device with the "object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." 545 U.S. at 936-37. In addition, the Court found that defendants showed themselves "to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users." *Id.* at 939. Here, Defendants' "clear expression or other affirmative steps taken to foster infringement" include designing their service to retrieve music files from known offshore pirate websites; promoting their service with an image showing copyright infringement; giving direct assistance to users who were engaging in specific infringing activity; and openly admitting that they have designed their service to shield copyright infringers and thwart copyright enforcers. *See* pp. 3-8, *supra*. Further, by actively promoting their service as "Popcorn Time for music," and by trying to attract former Grooveshark users, Defendants aim to appeal to users of those infringing services, thus showing themselves to be "aiming to satisfy a known source of demand for copyright infringement."

In *Columbia Pictures Industries, Inc. v. Fung*, the district court found that the defendants had induced copyright infringement, and discussed as evidence of that inducement the fact that the defendants "disseminated a message 'designed to stimulate others' to commit infringement." 2009 WL 6355911, at *11 (C.D. Cal. Dec. 21, 2009) (quoting *Grokster*, 545 U.S. at 916).  The court also noted as evidence of inducement that "Defendant Fung . . . provided technical assistance to users seeking copyrighted works," and specifically "provided directions on how to extract and play [a Lord of the Rings] video file." *Id.* at *12.  The defendants also showed intent to induce through "implementation of certain technical features in their web-sites" that were meant "to induce copyright infringement." *Id*. at *14.  Similarly, in *Hotfile*, the Court listed as a factor supporting a finding of inducement acts such as "advertising an infringing use or instructing how to engage in an infringing use."  2013 WL 6336286, at *30 (internal citations omitted).  As noted above, the Defendants here have engaged in all these activities, and more. *See* pp. 3-9, *supra*.  By doing so, Defendants are intentionally inducing copyright infringement.

### 2.        Defendants Are Committing Contributory Copyright Infringement

A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Comm'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (quoting *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987)).  Contributory infringement requires proof only of Defendants' actual or constructive knowledge of infringement and material contribution to infringement. *Id*. at 846.

There is overwhelming evidence here both of Defendants' material contribution to their users' infringing activities and their actual knowledge of the infringing activity caused by their service.  First, material contribution to infringement is established by showing that Defendants "established or assisted others' infringement," *Arista Records LLC v. Lime Grp. LLC*, which can

include providing the "site and facilities" making infringement of copyrighted music possible, *Napster*, 239 F.3d at 1022.  Here, by, *inter alia*, providing a service that gives its users immediate and seamless access to pirate web sites and that enables unauthorized downloading of copyrighted music to users' computers, Defendants are materially contributing to infringement.  *See, e.g.*, *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 652 (N.D. Ill. 2002) (finding that the defendants materially contributed to infringing activities because "users wishing to download music . . . need merely click on a play button and the Aimster software automatically creates a connection with another users' computer to facilitate the transfer . . . . Aimster predicates its entire service upon furnishing a 'road map' for users to find, copy, and distribute music . . . .") (some internal quotation marks omitted).  Indeed, here, as in the *Aimster* case, "Defendants manage to do everything but actually steal the music off the store shelf and hand it to Aimster's users."  *Id*.

Second, Defendants' actions and their many public statements already have established not merely their constructive but also their actual knowledge of infringement by users of their service.  This evidence includes Defendant Sampson's assistance to users engaging in obviously infringing downloads of popular music; Defendants' targeting of known pirate sites as the source of music files; their promoting the website with a prominent image of infringement of the Pink Floyd album *The Wall*; and their designing the service to spot and weed out decoy files used by copyright owners to try to deter infringement.  Therefore, Defendants are committing contributory copyright infringement.

### 3.  Defendants Are Committing Vicarious Infringement

A defendant is liable for vicarious copyright infringement if it (1) has the right and ability to control the infringing activity of others and (2) derives a direct financial benefit from that activity, regardless of the defendants' knowledge or state of mind regarding the infringement.

*See Grokster*, 545 U.S. at 930; *see also Hotfile*, 2013 WL 6336286, at *38. Here, by Defendants' own admission, their conduct satisfies both elements of vicarious infringement.

First, Defendants have the right and ability to control the infringing activity of Aurous users. A defendant's "ability to block infringers' access to a particular environment for any reason whatsoever" constitutes proof of its right and ability to supervise and control the infringing activities. *Napster*, 239 F.3d at 1023; *see also Hotfile*, 2013 WL 6336286, at *38 (stating that courts agree that "service providers have the capacity to control the activities of their users simply by virtue of providing the means to commit direct infringement"). Here, Defendants have the right and ability to stop or limit the infringing activity occurring via their service but take no steps to do so. For instance, Defendants appear to have begun to implement the ability for the service to require user accounts, a common method used to take steps such as banning infringers, but Defendants decided to allow use of their service without user accounts. *See* p. 7, *supra*. Defendants also can control the activities of their users through automatic software updates – in which they engage – and have admitted that they have the ability to filter infringing content but choose not to do so. *See id*. Far from stopping the infringing activity, Defendants designed and maintain their service to shield users from takedown requests and from monitoring by copyright owners. *See id*.

Second, the direct financial benefit element is satisfied where, as here, copyright infringement acts as a "draw" for customers. *See, e.g.*, *Hotfile*, 2013 WL 6336286, at *39 ("[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even significant, draw – rather, it only need be a draw.") (internal citations omitted). This is so even if Defendants do not currently charge a fee or show advertising, because they can choose to monetize their user base later. For example, in *Napster*, the

defendant collected no revenues for its service and charged its users no fees, because it planned to "delay the maximization of revenues while it attract[ed] a large user base," reasoning that "[t]he value of the system grows as the quantity and quality of available music increases." *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp.2d 896, 902 (N.D. Cal. 2000), *aff'd in relevant part*, 239 F.3d 1004 (9th Cir. 2001). Despite the fact that Napster was a free service with no advertising, the *Napster* district court and the Ninth Circuit agreed that the defendants' conduct satisfied the "direct financial benefit" prong of vicarious liability, because "Napster's future revenue [was] directly dependent upon 'increases in userbase.'" *Napster*, 239 F.3d at 1023. Here, copyright infringement is not merely "a" draw to Defendants' service, it is the sole reason for using it, and Defendant Sampson has admitted his intent to monetize this user base later. *See* pp. 7-8, *supra*. Therefore, Defendants are committing vicarious copyright infringement.

**B.    Defendants' Infringing Conduct Is Irreparably Harming Plaintiffs in Ways That Cannot Be Remedied Without Injunctive Relief Now**

Irreparable harm justifying Court intervention for preliminary injunctive relief has been described as "harm to the plaintiff's legal interests that could not be remedied after a final adjudication." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). For example, "[a] plaintiff may establish irreparable injury where the total damages associated with plaintiff's losses would be difficult to calculate." *National Auto Lenders, Inc. v. SysLOCATE, Inc.*, 753 F. Supp.2d 1233, 1236-37 (S.D. Fla. 2010); *see also WPIX*, 691 F.3d at 285 ("Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss.").

Defendants' unlawful conduct is causing just such irreparable harm to Plaintiffs – worsening every day – for at least the following reasons, any one of which is sufficient to justify relief:

15

1.     Defendants' promise of something for nothing, at the expense of music copyright owners, has generated intense interest in their service, which is resulting in a rapidly increasing number of users employing Aurous to infringe Plaintiffs' copyrights.  Once distributed, Defendants' software itself can be limitlessly copied.  Accordingly, every day that Defendants continue to make their service available results in additional ongoing infringement of Plaintiffs' copyrights that cannot be stopped later.  *See* Leak Decl. ¶ 9(b); McMullan Decl. ¶ 9(b); and Hochberg Decl. ¶ 9(b); *see, e.g.*, *Elektra Entertainment Group, Inc. v. Bryant*, 2004 WL 783123, at * 7, n.5 (C.D. Cal. Feb. 13, 2004) ("When digital works are distributed via the internet . . . every downloader who receives one of the copyrighted works . . . is in turn capable of also transmitting perfect copies of the works.  Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright.") (internal citation omitted); *see also Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp.2d 1003, 1013 (C.D. Cal. 2011) (harm caused by a service that is designed to be "scalable" to support a growing number of users justifies preliminary injunctive relief where harm "will continue to increase" before trial); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp.2d 1197, 1218 (C.D. Cal. 2007) ("When StreamCast induces infringement, Morpheus end-users obtain 'perfect copies' of [p]laintiffs' work that can be inexpensively reproduced and distributed *ad nauseam*.").

2.     Defendants are causing the unauthorized copying and distribution of Plaintiffs' copyrighted recordings in numbers that are impossible to know and thus impossible to quantify.  *See* Leak Decl. ¶ 9(a); McMullan Decl. ¶ 9(a); and Hochberg Decl. ¶ 9(a); *see also MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) (finding that harm which is "difficult, if not impossible, to quantify" is "irreparable harm which cannot be undone through monetary

remedies"); *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003) ("The recording industry's harm . . . would undoubtedly be irreparable" because "[t]he industry's damages from Aimster's contributory infringement cannot be reliably estimated."); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp.2d 1058, 1066 (N.D. Cal. 2000) (finding such harm is irreparable harm "because it is neither easily calculable, nor easily compensable, and is therefore an appropriate basis for injunctive relief").

3.      Defendants' illegal service deprives Plaintiffs of the ability to control "when, where, to whom, and for how much" they will distribute their copyrighted works, *WTV Sys.*, 824 F. Supp.2d at 1012, which undermines in unquantifiable ways copyright owners' core "right to exclude" others from exploiting their copyrights.  *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010); *see also* Leak Decl. ¶ 9(d); McMullan Decl. ¶ 9(d); and Hochberg Decl. ¶ 9(d). "Copyright licenses are designed to support the right to exclude; money damages alone do not support or enforce that right." *Jacobsen v. Katzer*, 535 F.3d 1373, 1381-82 (Fed. Cir. 2008).

4.      By exploiting Plaintiffs' music without paying any fees, Defendants unfairly compete against legitimate online music services and therefore threaten to undermine the value of the Plaintiffs' copyrighted recordings to such services, which in turn threatens to burden Defendants' negotiating positions with such services.  Leak Decl. ¶ 9(c) and (e); McMullan Decl. ¶ 9(c) and (e); and Hochberg Decl. ¶ 9(c) and (e); *see also WPIX*, 691 F.3d at 285-86 (stating that copyright infringement "undermin[es] existing and prospective . . . negotiations[] and agreements" concerning protected works and thus causes irreparable harm).

5.      Defendants' business is only recently formed, has no more than a few employees, and has no known current source of income apart from its infringing activities.  Accordingly, Defendants would be unable at the conclusion of the case to compensate Plaintiffs for even a

17

small fraction of the harm caused by their conduct.  Leak Decl. ¶ 9(f); McMullan Decl. ¶ 9(f); and Hochberg Decl. ¶ 9(f).  Defendants' practical inability to pay damages is further justification for preliminary injunctive relief.  *See, e.g.*, *WPIX*, 691 F.3d at 286 ("The unlikelihood that defendants . . . would, in any event, be able to satisfy a substantial damage award further supports a finding of irreparable harm.") (internal quotation marks and alteration omitted); *In re Aimster*, 334 F.3d at 655 (affirming preliminary injunction in part because defendants would "be unlikely ever to have the resources to pay" compensatory damages).

### C.      The Balance Of Hardships Weighs Decidedly In Favor Of Plaintiffs

Defendants' infringing service is daily causing irreparable harm to Plaintiffs, as well as to innocent third parties such as recording artists and other royalty participants and legitimate digital retailers.  In contrast to the irreparable harm to Plaintiffs and others in the absence of preliminary relief, the issuance of such relief imposes little to no burden on Defendants, and certainly no legally cognizable burden.  Having engaged in the flagrant scheme to encourage, facilitate, and cause the wholesale infringements of Plaintiffs' copyrighted recorded music, Defendants are in no position to complain that preliminary injunctive relief would disrupt their illicit operations.  *See, e.g.*, *Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Manu. Co., Ltd.*, 2012 WL 529967, at *5 (S.D. Fla. Feb. 26, 2012) ("The only thing that [the defendant] will be prevented from doing is from selling infringing products, a loss which it may justifiably be called upon to bear.") (internal citation and alteration omitted); *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp.2d 1078, 1083 (S.D. Fla. 2007) (observing that "a company cannot build a business on [copyright] infringements and then argue that enforcing the law will cripple that business") (quoting *CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F. Supp.2d 1333, 1345 (S.D. Fla. 1998)).

### D.     Public Policy Favors The Issuance Of A Temporary Restraining Order And Preliminary Injunction

It is well established that "[t]he public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works." *C.B. Fleet*, 510 F. Supp.2d at 1084.  The public interest in favor of a preliminary injunction is particularly strong in a case involving the facilitation of wholesale copyright infringement. *See, e.g.*, *In re Aimster*, 510 F. Supp.2d at 1084.

## II.     AN INJUNCTION BOND SHOULD BE WAIVED

The bond requirement of Rule 65(c), Fed. R. Civ. P., is appropriately waived in certain circumstances. *See Baldree v. Cargill, Inc*., 758 F. Supp. 704 (M.D. Fla. 1990), *aff'd*, 925 F.2d 1474 (11th Cir. 1991).  Here, because the balance of the equities weighs overwhelmingly in Plaintiffs' favor and because a business devoted to promote and profit from copyright piracy cannot reasonably argue that its legitimate business interests are threatened, no bond is necessary. *See C.B. Fleet*, 510 F. Supp.2d at 1083.  In the alternative, any bond should be set in a minimal amount.

## CONCLUSION

Plaintiffs have demonstrated a substantial likelihood of success on the merits.  Absent a TRO and a subsequent preliminary injunction, Plaintiffs will suffer immediate and rapidly growing irreparable harm that simply cannot be remedied later.  Any purported harm to Defendants from nipping an illicit business in the bud is both negligible and not legally cognizable.

Because the requested TRO is needed to prevent immediate and irreparable harm to Plaintiffs, Plaintiffs respectfully request that the Court immediately issue the requested TRO to remain in effect until completion of a preliminary injunction hearing.  As set forth in the attached

proposed Order, Plaintiffs request a TRO and a preliminary injunction enjoining Defendants and those in active concert with them and those that aid and abet their conduct from continuing to provide, support, maintain, and operate their infringing service and infringe Plaintiffs' copyrights.

Plaintiffs request that, pursuant to Rule 65(b)(3), Fed. R. Civ. P., a preliminary injunction hearing be set at the earliest possible date.

Dated:  October 14, 2015                          Respectfully submitted,

                                   By:   /s/ Karen L. Stetson
                                         Karen L. Stetson

                                         GRAY-ROBINSON, P.A.
                                         Karen L. Stetson
                                         333 S.E. Second Avenue, Suite 3200
                                         Miami, FL  33131
                                         Telephone:  (305) 416-6880
                                         Facsimile:  (305) 416-6887

                                         WILLIAMS & CONNOLLY LLP
                                         Thomas G. Hentoff (*Pro Hac Vice motion filed*)
                                         Casey L. White (*Pro Hac Vice motion  filed*)
                                         725 12th Street, NW
                                         Washington, DC  20005
                                         Telephone:  (202) 434-5000
                                         Facsimile:  (202) 434-5029

                                         *Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that the foregoing was filed via CM/ECF and was served via Hand

Delivery to ANDREW SAMPSON and AUROUS GROUP, INC., 13500 N.E. 3rd Court, # 222,

North Miami, Florida 33161 and via e-mail to <u>Andrew@aurous.me</u> on this 14th day of October,

2015.

By: <u>/s/ Karen L. Stetson</u>
Karen L Stetson